## AFFIDAVIT

I, Justin T. Delaney, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives ("ATF") since February 2020, and I am presently assigned to the Providence Field

Office of the Boston Field Division. My responsibilities are to investigate and prevent offenses

involving the unlawful use, manufacture, sale and possession of firearms and explosives, as well

as to investigate violations of federal arson statutes. I attended and successfully completed the

Department of Homeland Security Criminal Investigator Training Program and ATF Special

Agent Basic Training at the Federal Law Enforcement Training Center in Brunswick, Georgia.

2.      Prior to my employment as an ATF Special Agent, I was employed by the

Massachusetts Probation Service from 2015 to 2020, most recently as a Probation Officer at the

Westboro District Court. I earned a Bachelor of Science degree in criminal justice from

Westfield State University in 2012.

3.      While employed as a Special Agent, I have investigated violations of local, state,

and federal criminal statutes; made arrests, prepared search and arrest warrant affidavits;

interviewed defendants, witnesses, and informants; and seized currency, firearms, narcotics, and

other evidence related to criminal investigations. I have experience and training in firearms and

narcotics trafficking cases, gang investigations, the utilization of informants and cooperating

witnesses to investigate firearms and narcotics trafficking and other organized criminal activity,

and investigations related to acts of arson.

4.    The information in this affidavit comes from my personal observations, information obtained throughout the investigation, my training and experience, information obtained from other law enforcement agents with experience in the investigation of arsons, and information obtained from other sources as specified in the body of this affidavit. The affidavit is intended to show that there is sufficient probable cause for the requested warrants. This affidavit includes only those facts I believe are necessary to establish probable cause for the issuance of the requested warrant and does not include all of the facts uncovered during the investigation.

## PURPOSE OF AFFIDAVIT

5.    Based upon facts presented in this affidavit, there is probable cause to believe that KEVIN COLANTONIO (born ██████████ (hereafter "COLANTONIO") committed the offense of Maliciously Damaging or Destroying by means of Fire or Explosion any Building or Other Real Property in violation of 18 U.S.C. § 844(i), the "Subject Offense." This affidavit is being submitted in support of a Criminal Complaint and Arrest Warrant charging COLANTONIO with the Subject Offense.

6.    Additionally, because probable cause exists to believe that COLANTONIO committed the aforementioned Subject Offense, for the reasons set forth below, probable cause also exists to believe that evidence, fruits, and instrumentalities of the Subject Offense will be found in the following places, also set forth in Attachment A-1 and A-2:

i.    The residence of 154 Obed Avenue Apt. #5 North Providence, RI 02904, which is further described as a three-story brick apartment building with white colored windows and shutters. 154 is posted above the main

2

entrance to the apartment building. Apartment #5 is located on the second floor and has the number five (5) affixed to the front of the door;

ii.   the person of Kevin COLANTONIO (Born ███████████ ).

Further probable cause exists to believe that items described more fully below and in Attachment B will be found in the locations set forth above and in Attachment A-1 and A-2.

## **PROBABLE CAUSE**

7.      The ATF, North Providence Police Department ("NPPD"), and the Rhode Island State Fire Marshals Office are investigating a fire that occurred at the Shiloh Gospel Temple located at 974 Charles Street North Providence, RI 02904 that resulted in significant property damage.

8.      On February 11, 2024, at approximately 12:12 AM, members of the NPPD and North Providence Fire Department ("NPFD") were dispatched to Shiloh Gospel Temple located at 974 Charles Street North Providence, RI 02904 for the report of an individual attempting to set the building on fire. The church is located on the northwest corner of the intersection of Charles Street and Volturno Street. Upon arrival, NPPD Patrolman Howe and NPPD Patrolman Macera observed five active flames around the exterior of the building. While awaiting arrival from the NPFD, Patrolman Howe and Patrolman Macera used their assigned patrol vehicle fire extinguishers to extinguish the flames, which they were able to do. NFPD arrived on scene shortly after, made entry into the building and confirmed the building was not occupied and that there were no other flames. RI State Fire Marshal Hannah Burnes, RI State Fire Marshal James Givens, NPPD Detective Christopher Cote, and your affiant responded to the scene between 1:10

AM and 2:30 AM. Posted below is a photograph of the sign and front entrance to the Shiloh Gospel Temple.



9. Upon arrival, investigators were informed by NPPD Patrolman Macera that the reporting party who called NPPD to report the fire, identified as Witness #1 (born ▮▮▮▮▮▮▮▮), stated she had observed a male walking back and forth near the rear of the building looking at the flames. Witness #1 indicated that the male had a gas can in his hand, leading her to believe that the male was attempting to set the building on fire. Witness #1 indicated that she had several videos from her home security camera system that reportedly showed the male walking back and forth from the area around the building.

4

10.      NPPD Det. Cote and your affiant received information that Patrolman Macera recalled seeing an unidentified male walking southbound in the area of Charles Street and May Street while responding to an unrelated call for service at approximately 11:53 PM. Patrolman Macea recalled seeing the unidentified male carrying what appeared to be a gas can in his hands, which prompted Patrolman Macera to respond to the Cumberland Farms gas station located at 1040 Mineral Spring Avenue, believing that the suspect could have obtained gasoline from the gas station. Upon arrival, Patrolman Macera made contact with Witness #2, an employee at the Cumberland Farms gas station, who indicated that shortly before midnight on February 11, 2024, a male walked into the store with a gasoline canister, purchased ten dollars ($10.00) worth of gasoline and a royal blue colored Bic handheld lighter. Witness #2 stated that the male walked out to pump number twelve (12), filled the gasoline canister, and left. Witness #2 stated that the male did not pump all of the gas that he had purchased and did not return inside the store to collect his change.

11.      Patrolman Macera viewed the video surveillance footage at Cumberland Farms and observed that the footage showed a white male wearing a dark blue colored sweatshirt, dark colored beanie cap, blue jeans and dark colored shoes. The video surveillance footage showed the individual complete the purchase of the gasoline and Bic lighter, pump gas into the gas canister at pump number twelve (12) and exit the area of the gas station on foot in the direction of Vincent Avenue. Patrolman Macera captured a still image of the unidentified male at the store's register which is posted below. The image below features the unidentified male at the register and placed in front of him is a red-colored gas canister. A purchase receipt was later obtained by investigators which indicated the purchase of gasoline and the blue colored Bic lighter, purchased by the individual featured in the photograph took place at 12:00:31 AM on

February 11, 2024. The purchase took place approximately twelve minutes prior to the NPPD

patrol units being dispatched to a report fire at the Shiloh Gospel Temple located approximately

0.4 miles away from the gas station.



12.    Prior to the start of the fire on February 11, 2024, on Saturday February 10, 2024,

at approximately 10:15 pm, the NPPD received a call for service from E.P. who identified

himself as the Pastor of Shiloh Gospel Temple Ministry, located at 974 Charles Street, North

Providence RI, 02904. E.P. indicated he was on a flight returning from South Carolina and while

on the plane, he used his cellular device to remotely access his Ring camera doorbell which was

affixed to the exterior of the church. While viewing the video, he observed a male subject with

light skin, and what appeared to be a mask below his nose. E.P. reported that the subject was

trying to break into the church. E.P. spoke to the male subject through the ring camera, telling

him, among other things, that this was a church. The male subject continued trying to break in

the door, and then broke the Ring camera off the side of the building.

6

13.     The NPPD Patrol Division responded to the Shiloh Gospel Temple Ministry. Patrol Officers located a screen that had been removed from a window on the south side of the Church. They also found a damaged doorframe and some splintered wood on the ground nearby. The door itself was intact and secure. The Ring camera was recovered by police, along with a black winter glove.

14.     Accelerant Detection Canine ("ADC") "Dream" and her handler RI State Fire Marshal Hannah Burnes performed a survey of the scene. Your affiant spoke to RI State Fire Marshal Hannah Burnes and with RI State Fire Marshal James Givens, who informed your affiant that ADC Dream alerted to the potential presence of an ignitable liquid in multiple areas around the exterior of the building. Your affiant was informed that samples were taken from the scene and are pending submission to the Rhode Island State Crime Laboratory (RISCL) for additional analysis.

15.     On February 11, 2024, NPPD Det. Cote, ATF SA Croke, ATF Task Force Officer Sullivan and your affiant reported to Cumberland Farms Gas Station located at 1040 Mineral Spring Avenue to review the video surveillance footage from February 10, 2024, and February 11, 2024. While reviewing the video surveillance footage, investigators observed that at approximately 11:56 PM on February 10, 2024, the unidentified white male was observed walking through a set of privacy bushes along Vincent Avenue. Vincent Avenue is to the south of the Cumberland Farms and in the direction of the Shiloh Gospel Temple. The unidentified white male then proceeds across the parking area of the Cumberland Farms and enters the store. As noted above, the unidentified white male wearing a dark blue colored sweatshirt with the hood covering his head, dark colored beanie cap, blue colored jeans and dark colored shoes was

observed paying for the aforementioned gasoline and blue colored Bic lighter and proceeds to pump gas into the gas canister at gas pump number twelve (12). At approximately 12:01 AM on February 11, 2024, the unidentified white male was observed walking back across the parking lot of the gas station, through the same privacy bush along Vincent Avenue out of view of the Cumberland Farms video surveillance cameras.

16.      While reviewing the video surveillance footage from February 10, 2024, and February 11, 2024, the assistant manager at Cumberland Farms informed investigators that she had shared the still image of the unidentified white male amongst staff and was informed that an employee, Witness #3, who worked the 11 PM to 7 AM shift, recalled seeing the same individual on February 7, 2024 during his shift, and believed he was a regular customer at the store. Investigators viewed the video surveillance footage from February 7, 2024, and observed that at approximately 11:10 PM, the same unidentified white male wearing the same dark blue colored sweatshirt with the hood covering his head, dark colored beanie, and dark colored shoes, entered the front of the gas station. Investigators made note that the individual was wearing light-colored blue jeans and a dark colored jacket. The white male purchased one coffee at approximately 11:14 PM and paid for the item with what appeared to be a Citizens Bank Credit or Debit card. The unidentified white male was then observed exiting the gas station at approximately 11:15 PM and walked across the parking lot of the gas station towards Mineral Spring Avenue east bound towards Pawtucket RI, and out of view of the Cumberland Farms video surveillance cameras.

17.     The store manager provided investigators with a copy of the receipt from the purchase made on February 7, 2024, which indicated that the last four digits on the Debit or Credit card used to make the purchase were 8434.

18.     On February 12, 2024, NPPD Det. Cote, who also is a deputized Task Force Officer ("TFO") with the Federal Bureau of Investigation, served a Federal Grand Jury Subpoena to Citizens Bank Corporate Security for information related to the Citizen Bank account associated with Credit or Debit card number ending in 8434. Citizens Bank Corporate Security provided a name and date of birth as a preliminary response to the Federal Grand Jury Subpoena, which revealed the owner of the account associated with the Citizens Debit/Credit Card ending in 8434, that was used during the purchase made on February 7, 2024, as Kevin D. COLANTONIO (Born ██████████). Investigator reviewed license photos, an expired Rhode Island Driver's (RI Driver's License #: xxxx620) and an active Florida Driver's License (FL Driver's License #: xxxxxxxx4710) both assigned to COLANTONIO, and the license photo images match the still images of the unidentified white male from the surveillance video on February 7, 2024, February 10, 2024, and February 11, 2024. Featured below are the driver's license photographs in comparison to still images recovered from the Cumberland Farms from February 7, 2024, and February 11, 2024.



FL License Photo



RI License Photo



Cumberland Farms (2-11-24)



Cumberland Farms (2-7-24).

19.    Between February 12, 2024, and February 13, 2024, investigators viewed over a dozen video surveillance systems in areas between Cumberland Farms and Shiloh Gospel Temple and retrieved footage from at eight video surveillance systems to date.  This footage shows COLANTONIO traveling south bound along the east side of Charles Street on the side walk in the direction of Shiloh Gospel Temple carrying the red-colored gas canister between approximately 12:02 AM and approximately 12:10 AM. It is at approximately 12:12 AM, when patrol units with the NPPD are dispatched to the Shiloh Gospel Temple for the report of a

suspected fire. See below for a chronological set of sample images collected from video surveillance footage of COLANTONIO on February 11, 2024. Note that the images were modified for brightness:



- Approximately 11:55 PM on February 10, 2024– Footage from Arigna Irish Pub – 1058 Charles Street North Providence, RI 02904. Suspect is observed on foot walking Northbound towards Cumberland Farms with red-colored gas canister. While the video does not feature the presence of a consistent time stamp, I reviewed the video and at the start of the video it begins at approximately 11:50 PM on February 10, 2024.

11







- Approximately 12:00:31 am on February 11, 2024 (According to purchase receipt obtained from Cumberland Farms). Suspect is observed paying for $10.00 (USD) (According to purchase receipt) worth of gasoline and pumps the gasoline into the red-colored gasoline canister at Pump #12.



- Approximatley 12:03 am on February 11, 2024 – Footage from Arigna Irish Pub – 1058 Charles Street North Providence, RI 02904. Suspect is observed having just left the area of Cumberland Farms and proceeds southbound on Charles Street in the direction of the the Shiloh Gospel Temple carrying a red-colored gas canister. While the video does not feature the presence of a consistent time stamp, I reviewed the video and at the start of the video it begins at approximately 11:50 PM on February 10, 2024.



- Approximately 12:04 am on February 11, 2024 – Footage from Imperial Tile & Marble Works Inc. - 1006 Charles Street North Providence, RI 02904. Suspect is observed continuing to walk southbound on Charles Street towards the Shiloh Gospel Temple still carrying the red-colored gas canister. Based upon a review of the video suvreillance footage in conjunction with the timeline of events between February 10, 2024, and February 11, 2024, I believe the timestamps on the video to be true and accurate.



- Approximately 12:05 AM on February 11, 2024 - 985 Charles Street - Surveillance Camera System. Suspect is observed contining to walk Southbound on Charles Street on the East Sidewalk, and is now approximately 290 feet away from Shiloh Gospel Temple. Based upon training and experience, and having viewed numerous video surveillance footage over serveal different investigations, I know that video surveillance systems will often shift into "night time" mode resulting in the image appearing in black and white. Based upon a review of the video surveillance footage in conjunction with the timeline of events between February 10, 2024, and February 11, 2024, I believe the timestamps on the video to be true and accurate.







- Approximately 12:08 AM on February 11, 2024 Suspect is observed pouring a suspected igntable liquid around the exterior sturcture of the Shiloh Gospel Temple. Note video surveillance footage was requested and provided by the witness for time of the fire on February 11, 2024.



- Approximately 12:09 am on February 11, 2024 –. Suspect (above red circle) observed walking through the parking area of Shiloh Gospel Church parking lot. Note video surveillance footage was requested and provided by witness from time of the fire on February 11, 2024.



- Approximately 12:09 am on February 11, 2024 the suspect (above red circled) is observed walking away from the Shiloh Gospel Church on Volturno Street, prior to starting the fire. Your affinat noted at the end of the clip, a color image of the suspect walking which showed the suspect wearing dark clothing and carrying what appeared to be the red-colored gas cannister.



19





- Minutes later the suspect (above red circle) is observed on video surveillance footage returning to the parking area of the Shiloh Gospel Church. The suspect is then observed igniting a fire at the fence gate and then runs to the two exterior doors (with adjacent window) and ignites three fires in that area. The suspect is then observed walking to the front of the church and walks out of view of the video surveillance cameras.

-

20.    On February 12, 2024, at approximately 10:25 AM, NPPD Capt. John Brady and Lt. Ryan Furlong interviewed Witness #4, at her daughter's residence Witness #4 provided the following information to law enforcement:

At approximately 12:00 am on February 11th, 2024, she was ready to go to bed. She looked out her bedroom window at the parking lot of the church parking lot next door. As

20

she was watching, she saw someone dressed in a hoodie, with the hood up, however she indicated she could not see the persons face and made note that the individual was wearing dark clothing. Initially she thought it was someone walking to throw garbage in the dumpster which was adjacent to the building and rear fence. She recalled observing that the individual was hunched over carrying a suspected gasoline canister. She observed the individual pouring what she suspected was gasoline near the dumpster which was located at the rear the building. When she saw the individual pouring out suspected gasoline, she realized this was not someone throwing away garbage. She indicated that the individual used something to ignite a flame, however she did not see if it was a lighter or matches. She then indicated she grabbed her cellular phone and when she walked out to her dining room, she could no longer see the subject. She recalled last seeing the suspect turn right (West onto Volturno Street) and observed still had the gas can in his hands when he was walking away from the building. She looked back and recalled seeing that the fire which had been set had gone out. She described the individual as wearing dark colored clothing. She did not know what skin color the individual had. She recalled only observing the individual pouring suspected gasoline from the gas canister in the area of the fence behind the building near the dumpster.

21.     On February 13, 2024, at approximately 3:00 PM, NPPD Lt. Ryan Furlong observed video surveillance of the interior common area of 154 Obed Avenue, North Providence, in the hallway outside apartment 5. The camera showed an individual matching COLANTONIO's description, wearing the same dark blue colored sweatshirt, dark colored beanie cap, blue colored jeans and dark colored shoes, and gloves featured in the surveillance footage from Cumberland Farms, make the following movements at the following dates/times:

- February 10, 2024:

  o Approximately. 9:27 PM COLANTONIO leaves apartment #5 with nothing in his hands, and appears to be wearing a dark colored overcoat over his sweatshirt

  o Approximately 9:28 PM, COLANTONIO returns and enters his apartment with nothing in his hands.

  o Approximately 9:29 PM, COLANTONIO leaves apartment #5 with nothing in his hands.

  o Approximately 11:34 PM COLANTONIO returns and enters his apartment with a red-colored gas canister. Investigators made note that COLANTONIO enters the apartment wearing the dark overcoat over his sweatshirt.

  o Approximately 11:47 PM COLANTONIO leaves his apartment with the red-colored gas canister. Investigators made note that COLANTONIO exits the apartment not wearing the dark overcoat.

- February 11, 2024:

  o Approximately 12:32 am COLANTONIO returns to his apartment without the red-colored gas canister, however appears to return with a suspected burglary tool, possibly a crowbar sticking out of his right front pocket.

22.     On February 13, 2024, at approximately 6:14 PM, NPPD Det. Cote and your affiant conducted a recorded interview with Witness #5 of Providence RI. Witness #5 identified

himself as the church administrator for the Shiloh Gospel Temple, and as such he handles the day-to-day operations of the church, and he provided the following which demonstrates that the building housing Shiloh Gospel Temple is used in interstate commerce or in any activity affecting interstate commerce:

   i.   Shiloh Gospel Temple is a local congregation that has been established for approximately 35 years. They have an approximately 100-person congregation.

   ii.  Pastor E.P. is the founder of the church.

   iii. The majority of the congregation is Black and African American; however, they do have Caucasian and Hispanic congregants as well.

   iv.  Shiloh Gospel Temple usually has service four times a week, on Tuesday, Friday evening, Sunday afternoon at 12:00 Noon, and Sunday evening at 7:00 PM. The building at 974 Charles Street is owned by Apostle E.P. Ministries, LLC. E.P. rents the building to two other churches, "Gods Favor House" led by E.P.'s brother, Pastor G.P., and "Transformation Church," led by Pastor P.H.. They have a contractual rental agreement and pay monthly rent for the use of the space. Rent is typically paid by check.

   v.   Congregants pay a sort of membership due referred to as, "tides and offerings" this can be paid in the form of Cashapp. Congregants can donate cash in the church. They also have a credit card machine at the church. Shiloh Gospel Temple has an online presence on the social media

23

platforms YouTube and Facebook. All of Shiloh Gospel Temple services are live streamed on these internet social media channels.

    vi.   Witness #5 estimated that Shiloh Gospel Temple has approximately 10-15 congregants and an affiliated pastor, Pastor S., from outside of the State of Rhode Island.

    vii.   The church is supplied by local shopping as well as ordering from vendors through Amazon.com when needed.

23.    Investigators conducted open-source research on the YouTube platform and observed "Shiloh Gospel Temple Ministries (LIVE)" having 255 subscribers and approximately 58,000 video views. These can be viewed anywhere the internet can be accessed.  Also, during the live streamed services, donations are solicited utilizing a QR code for Cashapp.

24.    On February 13, 2024, NPPD Det. Cote and your affiant conducted a recorded interview with Pastor E.P. Pastor E.P. provided the following information:

    i.   E.P. has been a Pastor in the state of Rhode Island for approximately thirty-seven (37) years and the Shiloh Gospel Temple does have congregants from outside of the state of Rhode Island.

    ii.   There are two other churches that operate at the building at 974 Charles Street. His brother Pastor G.P., and Pastor P.H., lead their own congregations and have weekly services. There is a rental agreement in place for them both. They do not rent the building for any other purposes.

24

    iii.   Services are broadcast on the social media sites, Youtube.com and Facebook. They engage with people outside the State of Rhode Island due to their online presence. There are sometimes 500-1000 people watching the video of Shiloh Gospel Temple services. They received donations from people in Florida. Donations can be accepted via electronic payment application Cashapp, Square, Zelle, or Credit Card.

    iv.   Shiloh Gospel Temple Services are also broadcast on local cable channels through Cox Communications and Verizon service providers.

25.    On February 12, 2024, between the hours of 6:30 PM and 10:00 PM members of the ATF Providence Field Office ("PFO") and NPPD Detective Cote conducted surveillance of COLANTONIO and his residence of 154 Obed Avenue Apt. 5 North Providence, RI 02904. Members of the ATF PFO entered the common area, proceeded to the second floor and observed Apartment #5 with the number 5 affixed to the door. During the surveillance, ATF SA Carpentier observed an individual matching COLANTONIO's description in a common area seated on the stairs in the main lobby of the apartment building, holding what appeared to be a cellular telephone.

26.    Additionally, during the surveillance operation Resident Agent in Charge (RAC) White and NPPD Det. Cote drove past the residence and observed an individual matching COLANTONIO's description in the front window of apartment #5. Investigators noted that the blinds on the window were open, allowing visibility into the apartment from approximately thirty

feet away. RAC White and NPPD Det. Cote observed the individual matching COLANTONIO's description slightly lean over and look out the front window as they drove past 154 Obed Avenue.

27. Based upon training and experience, and through consultation with other agents from ATF, and ATF Certified Fire Investigators (CFI), it is common for individuals who commit arson by fire, to leave and maintain physical evidence of such activities, including but not limited to, leftover materials to include but not limited to, ignitable liquids, containers and ignition devices) in their homes. Additionally, those who commit acts of arson often maintain possession of clothing that was worn during the commission of the act and could potentially maintain traces of ignitable liquids.

28. Based upon training and experience, and through consultation with other agents from ATF, and ATF Certified Fire Investigators (CFI), it is common for individuals who commit acts of arsons to utilize personal computers, cellular telephones and other electronic devices, in furtherance of conducting research and planning of the act, and evidence of such research and planning may be found in in their electronic media, to include cellular phones, computers and other electronic storage devices. Portable cellular devices are also known to maintain location data, photographs and video that are relevant to the commission of the crime. Based upon training and experience, individuals who utilize these electronic devices often maintain possession of these items on their person and/or in their residence. It is common for individuals who commit arsons to visit or research the planned site of the arson, prior to committing the arson, for the purposes of planning the successful execution of their criminal activity and their getaway. I also know that evidence of such research or prior connection/visitation to the arson

26

site is often maintained or stored at such individuals' homes, or electronic media, to include cell phones, computers and other electronic storage devices.

29.    It is common for individuals who have committed arsons by means of fire to research and collect news articles relating to the arson, for several purposes, including monitoring law enforcement's investigation and response to the fire, as well as self-gratification. I also know that evidence of such research and collection is commonly stored in their homes, and their electronic media, to include cell phones, computers, and other electronic storage devices.

30.    I know that the motivation for individuals committing arsons can be varied and complicated - such motivations may include money, revenge, excitement, depression or anger. I also know that evidence of an individual's motivation to commit an arson may be found in their homes, or electronic media, including cell phones, computers and other electronic storage devices.

31.    Additionally, it is also common for individuals who commit arsons to discuss criminal activities with trusted third parties, including friends or loved ones, after the arson has been committed, and that evidence of such communications may be found in their residences, cell phones, computers, and other electronic storage devices.

## CONCLUSION

32.    Based upon my training and experience, consultation with other agents from ATF, and ATF Certified Fire Investigators (CFI) and all of the facts and opinions set forth in this affidavit, I believe there is probable cause to believe that on February 11, 2024, in the District or Rhode Island, defendant KEVIN COLANTONIO maliciously damaged or destroyed, or

27

attempted to damage or destroy, by means of fire, real and personal property used in interstate or

foreign commerce or in any activity affecting interstate or foreign commerce, in violation of 18

U.S.C. § 844(i) (Count 1 – Arson). I therefore request that a warrant be issued for the arrest of

KEVIN COLANTONIO.

33.    Additionally, because probable cause exists to believe that COLANTONIO

committed the aforementioned Subject Offense, for the reasons set forth below, probable cause

also exists to believe that evidence, fruits, and instrumentalities of the Subject Offense will be

found in the following places as set forth in Attachment A:

    i.  The residence of 154 Obed Avenue Apt. #5 North Providence, RI 02904,
which is further described as a three-story brick apartment building with
white colored windows and shutters. 154 is posted above the main
entrance to the apartment building. Apartment #5 is located on the second
floor and has the number five (5) affixed to the front of the door;

    ii.  the person of Kevin COLANTONIO (Born ▮▮▮▮▮▮▮▮).

    iii.  Any digital device containing evidence falling within the scope of the
Subject Offense.

Respectfully submitted,

*Justin Delaney*

Justin Delaney
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF)

---

Attested to by the applicant in accordance with the requirements of Fed. R.
Crim. P. 4.1. by:  **Telephone** (specify reliable electronic means)

_____        _____
Date                                      Judge's signature

_____        _____
City and State                            Printed Name and Title

## ATTACHMENT A-1

## PROPERTY TO BE SEARCHED

The residence of 154 Obed Avenue Apt. #5 North Providence, Rhode Island 02904, which is further described as a red/brown brick colored building with white colored windows, and the number 154 affixed above the front entrance to the building. Apartment #5 is located on the second floor of the building, and the number 5 is affixed to the apartment door.

## ATTACHMENT A-2

## PERSON TO BE SEARCHED

The person of Kevin COLANTONIO, Date of Birth ██████████, Social Security

Number ████████, who is a white male. A photograph of COLANTONIO is shown below:



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

All records, in whatever form, including electronic devices, phones, and tangible objects that constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 844(i), including:

1. Materials and flammable liquids including but not limited to, flammable liquids, gas containers, lighters or similar devices used in the commission of igniting a flammable liquid.

2. Clothing worn in the commission of the arson, including but not limited to a dark blue colored sweatshirt, dark colored beanie hat, dark blue colored jeans, and dark colored shoes.

3. Any papers, photographs, items, communications, records or data (in paper or electronic form):

    a. Evidencing research relating to the commission of arsons by fire to include acts of arson against religious institutions including news articles, notes, journals, and books

    b. Evidencing materials about, connection with, or visits to Shiloh Gospel Temple;

    c. Evidencing a motivation for committing the arsons that occurred at the Shiloh Gospel Temple on February 11, 2024; to include manifestos, documented grievances, and maps.

          d. Any paper, items, communications, records or data (in paper or electronic form) tending to establish dominion and control over the location or item to be searched, identify the creator or user of the evidence described above, or place in context the evidence described above.

4. FINANCIAL RECORDS: All financial records of or relating to Debit and Credit cards in the name of Kevin COLANTONIO to include banking records showing account information and items purchased, his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks, bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money; Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

5. Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violation;

6.  Audio recordings, pictures, video recordings, or still captured images related the acts of arson or attempted arson;

7.  Contents of any calendar or date book;

8.  Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

9.  Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSE (18 U.S.C. § 844(i)), and forensic copies thereof.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1.  evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.  evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the lack of such malicious software;

4.  evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5.  evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6.  evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7.  evidence of programs (and associated data) that are designed to eliminate data from the device;

8.  evidence of the times the device was used;

9.  passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i.    Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.    Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.    Any incoming/outgoing text messages or other electronic messages relating to the above criminal violations;

    iv.    Telephone subscriber information;

    v.    The telephone numbers stored in the cellular telephone and/or PDA;

    vi.    Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

    vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the offense proscribed in 18 U.S.C. § 844(i).

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

      a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

      b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii.     The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further

order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

       g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

       h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## **DEFINITIONS**

For the purpose of this warrant:

A.    "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B.    "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.    "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a username; or a password), whether stored deliberately, inadvertently, or automatically.

D.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.    "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols, and shall include any form of computer or electronic storage (such as flash memory or other media that can store data and any photographic form). including email, text messaging, instant messaging, or other communications, and including any content that may be synchronized to or on the device from any service or application utilized by the subject all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below.  If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copies authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.